DANIEL A. McDONNELL and KAREN A. McDONNELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McDonnell v. Commissioner
Docket No. 25952-87
United States Tax Court
T.C. Memo 1990-60; 1990 Tax Ct. Memo LEXIS 60; 58 T.C.M. (CCH) 1351; T.C.M. (RIA) 90060; February 12, 1990
William Randolph Klein, for the petitioners. Charles A. Baer, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In a notice of deficiency dated May 6, 1987, respondent determined a deficiency of $ 1,266 in petitioners' Federal income tax for 1983. The issues are (1) whether petitioners are entitled to a business or a nonbusiness bad debt deduction under section 166; [1] and (2) whether the debt became worthless in 1983. *61 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Bolivar, Ohio, when they filed their petition in this case. Daniel A. McDonnell (Dr. McDonnell) has been an osteopathic physician engaged in practice in the Bolivar area since 1962. His wife, Karen A. McDonnell (Mrs. McDonnell), has been a registered nurse since 1962. From 1979 through 1983 Dr. McDonnell worked an average of 50 to 60 hours per week in his medical practice. In addition he was on call every other evening during the same period. On April 1, 1981, petitioner entered into a written agreement with Wesley P. Shank individually and Wesley P. Shank, Inc., an Ohio corporation. Pursuant to the terms of the agreement Dr. McDonnell advanced $ 200,000 to the corporation which was to prepare and submit proposals for federally aided housing projects to various Ohio housing authorities. The proposals were to reflect that Dr. McDonnell was the developer or owner of the housing projects, or had the right to have them assigned to him. Pursuant to the agreement Mr. Shank and his corporation *62 executed and delivered to Dr. McDonnell a promissory note in the face amount of $ 200,000, which under its terms was to be due in six months together with interest at the rate of 17 percent per annum if Mr. Shank and his corporation failed to deliver $ 5,000,000 in housing commitments to Dr. McDonnell. Attached to the agreement was a statement of Mr. Shank's assets and liabilities, and in the agreement Mr. Shank agreed that, while the note remained unpaid, he would not transfer or encumber certain parcels of real property without Dr. McDonnell's consent. With regard to their arrangement with Mr. Shank and his corporation, petitioners' activities were primarily confined to advancing the $ 200,000 and thereafter checking with Mr. Shank or his secretary by telephone on the progress of the proposals. However, they traveled to some unspecified sites for proposed housing projects and they reviewed some of the architectural drawings of unspecified sites. Occasionally they also received telephone calls from persons who were interested in obtaining subcontracts on proposed housing projects. Such calls were referred to Mr. Shank or his secretary because petitioners had no previous *63 experience in housing projects. In October 1981 Mr. Shank assured Dr. McDonnell that his $ 200,000 plus interest would be forthcoming from a lawsuit which Mr. Shank had filed in connection with a housing project in Athens, Ohio. The trial of this lawsuit was delayed until July 1984 by prolonged negotiations and even before its trial Dr. McDonnell discovered in June 1984 that Mr. Shank had settled the lawsuit for one third of its expected recovery and had assigned his rights to the recovery to another party. In a letter dated April 30, 1982, from their attorney, Albert L. Tidwell, petitioners were advised that Mr. Shank at that time had the capacity to secure funds, might be interested in an accommodation, and had otherwise indicated that $ 7,500 probably could be collected immediately. On Mr. Tidwell's recommendation, petitioners sued Mr. Shank in 1982 and secured a default judgment for $ 200,000. In a letter to Dr. McDonnell dated July 1, 1983, Mr. Shank stated: In view of the circumstances which transpired since Wesley P. Shank and Wesley P. Shank, Inc. borrowed $ 200,000 from you on April 1, 1981, I am concerned about protecting your interests as well as mine. In exchange *64 for your prior verbal gentleman's agreement not to proceed with any litigation against me in an attempt to undo any prior real estate transfers which I made during 1981 or 1982, and as a token showing good faith on my part, I, as well as S & D Construction Co., Inc. hereby transfer to you subsequent [sic] to attorney fees, an assignment in favor of Ohio Financial Service Corporation, and unpaid taxes, all our remaining rights to receive any proceeds which may result out of Franklin County, Ohio Case 82-CB084931 to the extent of my indebtedness to you. Wesley P. Shank further agrees to transfer to you all funds due from Donald Graber involving a Toledo HUD project in which Graber has agreed to pay a finder's fee for said project. Any payments received by you from Graber will be applied against the principal amount due under the terms of the April 1, 1981 note. In September 1983 petitioners received $ 72,000 from Donald Graber which was apparently the finder's fee referred to in the above letter and which was applied as a partial payment on the $ 200,000 debt. In 1984 petitioners retained another attorney, Gregory J. Rufo, to represent them in connection with collecting the *65 indebtedness of Mr. Shank and his corporation. In a letter to Dr. McDonnell dated July 11, 1984, Mr. Rufo listed five conveyances of real property made by Mr. Shank during 1981 and 1982 and stated that because of these possible fraudulent conveyances, petitioners might be able to reach the underlying properties or in the event of Mr. Shank's bankruptcy bring them into the bankrupt estate. Upon receipt of an attorney fee and proper authority from Dr. McDonnell, Mr. Rufo on July 18, 1984, filed a complaint for Dr. McDonnell against Mr. Shank, his corporation and others in the Court of Common Pleas, Wayne County, Ohio, alleging that Mr. Shank had fraudulently conveyed certain real properties, and asking for a judgment of $ 200,000 or, in the alternative, the entry of an order retransferring the properties to Wesley P. Shank. On or about August 15, 1984, petitioners filed a joint Federal income tax return for 1983 in which they claimed on Schedule D a short-term capital loss for a "bad debt" in the amount of $ 200,000. In his notice of deficiency, respondent determined that the short-term capital loss claimed by petitioners was "a nonbusiness loss which became totally worthless *66 in 1984." The record contains no evidence that through the end of 1983 petitioners ever received any income from or had any experience with any real estate, construction or public housing business other than through their association with Mr. Shank. OPINION Business bad debts are those which are created or are acquired in a taxpayer's trade or business. Business bad debts differ from nonbusiness bad debts in that (1) they can be deducted to the extent of their worthlessness at any time when they become partly or totally worthless and (2) they may generally be used to fully offset the taxpayer's other gross income. By contrast, a nonbusiness bad debt must be totally worthless in a particular year before it can be deducted and it may be deducted only as a short-term capital loss. Sec. 166. [2]
*67 Petitioners' primary contention is that their loss was a business bad debt. To the contrary, respondent contends that it was a nonbusiness bad debt. We agree with respondent. The courts have drawn a line of demarcation between business losses and investment losses. "When the only return is that of an investor, the taxpayer has not engaged in a trade or business since investing is not a trade or business." . See also ; and , affirming a Memorandum Opinion of this Court. On the issue of what constitutes a business the Supreme Court stated in , that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity" and that a "sporadic activity * * * does not qualify." From the record before us it is apparent that petitioners, who have the burden of proof, have failed to establish that their bad debt was created or acquired in a business. Dr. McDonnell was obviously *68 engaged full time in his medical practice. His testimony contained no reference to any activities with respect to Mr. Shank, his corporation, or the housing projects with the exception of how the agreement and note were executed, money was advanced, and his subsequent attempts to collect the $ 200,000 from Mr. Shank. Mrs. McDonnell testified that she and her husband visited some unspecified sites for proposed housing projects and that they reviewed some architect's drawings. Her other activities were limited to some phone calls primarily to Mr. Shank or his secretary. Any telephone calls which she received from persons interested in subcontracts on the housing projects were also referred to Mr. Shank. It is significant that the record contains no evidence that petitioners neither had any previous experience in real estate, construction, housing, or other business except the medical profession nor sought any advice or assistance by anyone in such a business. Consequently, they have failed to establish that their loss was created or acquired in a business. To the contrary, the record as a whole clearly demonstrates that petitioners were investors, and that the debt involved *69 was not created or acquired in a business. Moreover, on their 1983 return they reported their loss on Schedule D as a short term capital loss from a nonbusiness bad debt. This clearly indicates that at the time the return was filed they viewed themselves as investors. , affd. . Having concluded that petitioners' loss was a nonbusiness bad debt, we now turn to the issue of whether the debt was totally worthless in 1983. The test is whether the debt had lost its last vestige of value before the end of the taxable year. , affirming on this issue a Memorandum Opinion of this Court. To prevail on this issue petitioners must show some identifiable event during the year which demonstrates the absence of any potential value for the debt. The mere fact that the debt has not been paid does not prove it was worthless. The determination of worthlessness must be based on the facts known during the taxable year. , *70 affirming on this issue a Memorandum Opinion of this Court. We are satisfied that the debt in this case had some value at the close of 1983. First, petitioners were advised by their attorney in 1982 that they should file suit against Mr. Shank to collect the debt. Secondly, in July 1983 Dr. McDonnell received a letter from Mr. Shank agreeing to transfer funds to Dr. McDonnell which were due Mr. Shank from Donald Graber and to transfer to Dr. McDonnell, Mr. Shank's recovery in a state court lawsuit. In September 1983 Dr. McDonnell received $ 72,000 from Mr. Graber as partial payment on the loan. Thirdly, in July 1984 Dr. McDonnell upon the advice of another attorney filed a fraudulent conveyance action against Mr. Shank. Such actions, especially the institution of the fraudulent conveyance suit in July 1984, clearly indicates that petitioners considered the debt to have value as late as 1984. ; and . Accordingly, we conclude that petitioners' nonbusiness bad debt was not totally worthless in 1983. Decision will be entered for the respondent *71 . Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise noted.↩
2. SEC. 166. BAD DEBTS. (a) GENERAL RULE. -- (1) WHOLLY WORTHLESS DEBTS. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) PARTIALLY WORTHLESS DEBTS. -- When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) AMOUNT OF DEDUCTION. -- For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. * * * (d) NONBUSINESS DEBTS. -- (1) GENERAL RULE. -- In the case of a taxpayer other than a corporation -- (A) subsection (a) * * * shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year. (2) NONBUSINESS DEBT DEFINED. -- For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than -- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩